# In the United States District Court
## for the Southern District of Georgia
## Brunswick Division

DAVID SMILEY,

    Plaintiff,

v.

                                 CV 225-001

GLYNN COUNTY, GEORGIA, et al.,

    Defendants.

### ORDER

Before the Court is a motion to dismiss filed by Defendants Glynn County, Georgia, Glynn County Police Department, and police officers Kyle Gracia and Kenneth Miller, dkt. no. 18, as well as a motion to dismiss filed by police officer Victor Ramirez, dkt. no. 15. The motions have been fully briefed, dkt. nos. 15, 18, 25, 26, 28, 29, 34, and the Court held a motions hearing on August 11, 2025, dkt. no. 33. The motions are thus ripe for review.

### BACKGROUND

#### I.  Factual Background

In the cold, early morning hours of December 5, 2023, Plaintiff David Smiley was working as a cleaner outside the Cost Kutter Grocery, located in a strip mall on Altama Avenue in Brunswick, Georgia. Dkt. No. 1 ¶ 17; Dkt. No. 16-1 at 00:01-00:21. Just before 12:30 a.m., two officers from the Glynn

County Police Department ("GCPD") pulled up in the parking lot. Id. ¶ 18. Except for a small RV, the parking lot appeared to be empty. Dkt. No. 16-1 at 00:31-00:33.

Upon arriving at the scene, Defendants Gracia and Ramirez exited their patrol car and approached Plaintiff, who was standing in the well-lit covered walkway in front of the store and making a sweeping motion toward the ceiling with a long pole-type object. Dkt. No. 16-1 at 00:20-00:34. As the officers approached Plaintiff, it became evident that Plaintiff was actually holding a long-handled broom. Id. Gracia said "Morning," and Plaintiff lowered the broom. Id. at 00:34-00:39. Gracia asked, "You cleaning?" Id. at 00:39-00:41. Plaintiff responded, "Oh, yeah, yeah, yeah," and explained that he worked for his father's company, which was contracted by the store to clean the parking lot, the external walkway ceiling, and behind the parking lot. Id. at 00:42-01:05. At this time, Plaintiff, who was wearing a hooded sweatshirt, removed the hood from his head. Id. The walkway ceiling Plaintiff had been cleaning consisted of drop-down tiles. Id. The officers' body camera footage shows more than seventy ceiling tiles, one of which was askew. Id. A longboard skateboard can be seen on the walkway near Plaintiff. Id. Defendant Gracia asked if Plaintiff was "getting spider webs" down, and Plaintiff answered affirmatively. Id. Defendant Ramirez then asked, "What's the

2

company y'all work for?" Id. at 01:05–01:11. Without hesitation, Plaintiff responded, "D&B Sweepers." Id.

Next, Defendant Ramirez asked Plaintiff, "Do you have your license on you by any chance?" Id. at 01:13–01:14. Plaintiff stated that he did not have it, so the officers asked for his "basic information." Id. at 01:14–01:16. In response, Plaintiff asked, "For what, if you don't mind me asking?" and Defendant Ramirez replied, "It's loitering and prowling" "because it's 12:30 AM." Id. at 01:19–01:32. Plaintiff stated, "I am pretty sure no one called you." Id. at 01:26–01:37. About this time, the video shows someone—later identified as Plaintiff's girlfriend—get out of the small RV parked in the parking lot and begin walking toward the group. Id. at 01:22–01:27. Then, Plaintiff offered, "I'm working, just like you guys," and Defendant Ramirez responded, "Yeah, but businesses are closed." Id. Then, Defendant Ramirez said, "If you refuse to identify yourself, you'll be charged." Id. at 01:38–01:40. Plaintiff asked "For what? I have not done anything wrong. I am not loitering and prowling. I am working and making an honest dollar. I have not done anything wrong." Id. at 01:42–01:48.

At that point, Plaintiff's girlfriend had walked up to the group. Id. Defendant Ramirez again asked Plaintiff if he would identify himself, to which Plaintiff replied, "I have not done anything wrong." Id. at 01:48–01:52. The girlfriend stated that

3

she was with Plaintiff, and when the officers asked if she had her ID with her, she said that she did not. Id. at 01:56–02:01. She then proceeded to inquire about what was happening. Id. Plaintiff said, "They want me to identify myself," and Defendant Ramirez again said, "Yeah, for loitering and prowling." Id. at 02:05–02:11. Plaintiff again insisted that he was just working, and Defendant Ramirez repeated, "But it is 12:30 AM and the businesses are closed." Id. at 02:12–02:20. Plaintiff then said, "It doesn't matter what time I decide to work." Id. at 02:16–02:19. At that point, Defendant Ramirez said, "Alright, you know what, go ahead and put your hands behind your back" and proceeded to handcuff Plaintiff. Id. at 02:20–02:26. Plaintiff asked what he was being arrested for, and Defendant Ramirez responded, "You are going to jail for loitering and prowling and refusing to identify yourself." Id. at 02:31–02:36. Plaintiff again proclaimed that he was not loitering and prowling, to which Defendant Ramirez responded, "Alright." Id. Plaintiff said "I am working. I am working. Just like you guys." Id. at 02:43–02:47. As Defendant Ramirez was escorting Plaintiff to his patrol car, Plaintiff's girlfriend asked the officers why they could not call "the person who hired him to do this job," and she offered to make the call herself, but she did not say who the person was. Id. at 02:47–02:52, 02:59–03:04. After Defendant Ramirez walked off with Plaintiff, Defendant Gracia repeatedly

4

asked the girlfriend to identify herself. Id. at 03:00-06:37. The girlfriend did not provide that information but continued to insist that both she and Plaintiff had a right to be there. Id. She also asked, "Did the shopping center call? . . . because they know about it." Id. at 03:09-03:13. Plaintiff's girlfriend continually insisted that both she and Plaintiff "ha[d] permission to be [t]here," but Defendant Gracia stated that they were loitering and prowling by not identifying themselves. Id. at 03:52-04:07. Plaintiff's girlfriend said, "We aren't loitering because of the fact that he is hired here to do this job." Id. at 06:08-06:11. In response, Defendant Ramirez asked her, "Where's the contract [for the job]?" Id. at 06:11-06:18. Plaintiff's girlfriend asked, "You expect us to carry a contract on us?" Id. at 06:18-06:20. Defendant Ramirez answered that he was not "going to argue" with her and said she "could go to jail with [Plaintiff]." Id. at 06:20-06:23.

Ultimately, Defendant Gracia placed the girlfriend under arrest for not identifying herself and cuffed her. Id. at 06:38-07:07. Once the girlfriend was in handcuffs, she offered to give her information. Id. at 07:10-07:50. The girlfriend eventually identified herself and provided the officers with her name, address, and date of birth. Id. at 12:50-14:05. Defendant Gracia verified her information and released her. Id. at 14:06-15:59. After releasing Plaintiff's girlfriend, Defendants Ramirez and

Gracia got into their patrol car to take Plaintiff to the detention center. Id. at 16:15–17:17.

During the interaction with Plaintiff's girlfriend, Defendant Miller, another GCPD Officer, briefly appeared on the scene. Dkt. No. 1 ¶ 32; Dkt. No. 16-2 at 10:25. Defendant Miller stood with the other officers while they interacted with Plaintiff's girlfriend. Dkt. No. 16-2 at 10:56–16:00. Defendant Miller did not interact with Plaintiff at all and was not involved in the interaction other than asking Defendant Ramirez if Plaintiff tried to "take off." Id. at 13:33. Indeed, by the time Defendant Miller arrived on the scene, Plaintiff had already been secured in the patrol car for several minutes. Id. at 03:51 (placing Plaintiff in patrol car); id. at 10:25 (Defendant Miller's arrival).

Defendant Gracia drafted an "incident report or such other document providing a narrative of the incident and arrest from his perspective." Dkt No. 1 ¶ 34. Defendant Ramirez supplemented this report with the statement that "'Lt. Davis had took a second look at the report and advised we had no probable cause for loitering and prowling. Lt. Davis told me to go and drop the charge and take Mr. David Smiley where he needs to go.'" Id. ¶ 36. Upon arriving at the jail around "0500 hours to drop the charge," Defendant Ramirez was informed that Plaintiff had "bonded out." Dkt. No. 18-1 at 4. Defendant Ramirez returned to

headquarters to share this with Lieutenant Davis and noted "that it will be a 'No Warrant Received.'" Id. Plaintiff alleges that though he was held at the detention facility for only a few hours, his mug shot was posted online, which caused him "unwarranted humiliation." Id. ¶¶ 35, 39.

## II.  Procedural Background

Plaintiff filed suit on January 2, 2025 against Defendants Glynn County, Georgia, GCPD, and Glynn County police officers Kyle Gracia, Victor Ramirez, and Kenneth Miller in their official and individual capacities. Dkt. No. 1. Plaintiff asserts one count against all Defendants for unlawful search, seizure, excessive force, and false arrest, in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 (Count 1), one count against Defendant Miller for failure to intervene and supervisory liability under § 1983 (Count 2), and one Monell municipal liability count against Defendants Glynn County and GCPD (unnumbered Count). Id. at 7, 10, 12. Plaintiff also asserts state-law claims of assault and battery (Count 3) and false imprisonment (Count 4) against Defendants Gracia and Ramirez. Id. at 13. On March 14, 2025, Defendants filed motions to dismiss. Dkt. Nos. 15, 18. Plaintiff responded to each, dkt. nos. 25, 26, and Defendants replied, dkt. nos. 28, 29.

During the August 11, 2025 motions hearing, the parties agreed that Plaintiff's claims against Defendants Glynn County

and GCPD should be dismissed. Dkt. Nos. 25 at 5, 26 at 6. The parties also agreed that Plaintiff's official capacity claims against Defendants Gracia, Miller, and Ramirez and Plaintiff's assault and/or battery and false imprisonment claims against Defendant Gracia and Ramirez should be dismissed. Dkt. Nos. 25 at 5, 20, 26 at 6, 24.  In light of the parties' agreement, those claims are hereby **DISMISSED**.  Thus, the only claims that remain pending at this juncture are Plaintiff's Fourth Amendment claims against Gracia, Ramirez and Miller, in their individual capacities, and Plaintiff's failure to intervene and supervisory liability claim against Miller.

## LEGAL AUTHORITY

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A

8

complaint is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In deciding whether a complaint states a claim for relief, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016). The Court should not accept allegations as true if they merely recite the elements of the claim and declare that they are met; legal conclusions are not entitled to a presumption of truth. Iqbal, 556 U.S. at 678-79.

A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)). Ultimately, if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

While the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. The Court need not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Lastly, "[u]nder the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) 'the plaintiff refers to certain documents in the complaint,' (2) those documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed." Baker, 67 F.4th at 1276 (citations omitted). This doctrine has applied to "various types of documentary evidence" including body camera footage. Id. Here, the requirements are satisfied for the Court to consider the officers' video footage attached to Defendants' motions to dismiss without converting the motion into one for summary judgment. Dkt. No. 23-1. In this case, (1) Plaintiff references the footage in his complaint, albeit briefly, (2) the footage depicts the incident giving rise to Plaintiff's claims,

10

and (3) neither party disputes the authenticity of the footage. See Dkt. Nos. 1 ¶ 18, 16, 18-2. Furthermore, at the hearing, all the parties agreed that the Court can properly consider the body camera footage without converting the motion into one for summary judgment. Dkt. No. 33.

When a court "consider[s] the bodycam footage at the motion-to-dismiss stage," the court "view[s] it in the light most favorable to [the plaintiff]." Robinson v. City of Huntsville, No. 21-13979, 2022 WL 3867584, at *3 (11th Cir. Aug. 30, 2022). Additionally, "[w]hen [a court] review[s] video footage at the motion to dismiss stage, [it] 'must construe all ambiguities in the video footage in favor of the plaintiff.'" Jackson v. City of Atlanta, Ga., 97 F.4th 1343, 1350 (11th Cir. 2024) (quoting Baker v. City of Madison, Ala., 67 F.4th 1268, 1277 (11th Cir. 2023)). "[W]here [the] video is clear and obviously contradicts the plaintiff's alleged facts, [the court] accept[s] the video's depiction instead of the complaint's account, and [the court] view[s] the facts in the light depicted by the video." Id.

## DISCUSSION

Defendants' motions to dismiss have two main bases: qualified immunity and failure to state a claim for which relief can be granted. The Court addresses each in turn.

11

## I.    Qualified Immunity

To resolve the motions to dismiss filed by Defendants Ramirez and Gracia, the Court must determine whether, at this stage, Defendants Ramirez and Gracia are protected by qualified immunity for the claims against them in their individual capacities.

"In order to establish qualified immunity, a defendant first must show that she was acting within the scope of her discretionary authority at the time of the alleged misconduct." Paez v. Mulvey, 915 F.3d 1276, 1284 (11th Cir. 2019). Here, no one disputes that Defendants were acting within the scope of their discretionary authority during their interaction with Plaintiff.

"Once a defendant has established that [he] was acting within [his] discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. The defendant officer is "entitled to qualified immunity unless the plaintiff establishes that (1) [the defendant] violated a federal statutory or constitutional right, and (2) the unlawfulness of [the defendant's] conduct was clearly established at the time." Id. (citation and quotation marks omitted).

"Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the

12

alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted)). The Court "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." Id.

### A. Constitutional Violation

#### 1. Defendant Ramirez

Plaintiff asserts that he was arrested and transported to a local detention facility where he was held for a few hours before being released after a lieutenant determined no probable cause existed for Plaintiff's loitering and prowling charge. See Dkt. No. 1 ¶¶ 26, 33-36. Plaintiff contends that Defendant Ramirez committed a Fourth Amendment violation and that he is not shielded by qualified immunity. Dkt. Nos. 25 at 6, 26 at 8. Defendant Ramirez argues that dismissal is proper because there is no underlying Fourth Amendment violation and that he is entitled to qualified immunity. Dkt. Nos. 15 at 7-8, 15.

##### a. Time of Seizure

As a threshold matter, the Court must determine at what point Plaintiff was detained or "seized." Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000). Not every interaction between

13

a private citizen and the police amounts to a Fourth Amendment seizure. Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); United States v. Thompson, 712 F.2d 1356, 1359 (11th Cir. 1983). There are three levels of police encounters "with varying levels of Fourth Amendment scrutiny: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions [i.e., Terry stops]; and (3) full-scale arrests." United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011) (citation and quotations omitted). "Whether a seizure has occurred depends on whether a reasonable person, in light of the totality of the circumstances, would have believed that he was not free to leave." United States v. Brown, 700 F. App'x 976, 978 (11th Cir. 2017) (per curiam). As the United States Supreme Court has recognized, the subjective intention of an officer to detain a person had that person attempted to leave "is irrelevant except insofar as that may have been conveyed to the [person]." United States v. Mendenhall, 446 U.S. 544, 554 n.6 (1980). Likewise, the inquiry is not whether Plaintiff believed he was free to leave but whether a reasonable person would have such a belief under the same circumstances.

Defendant Ramirez asserts that the entire interaction with Plaintiff could be considered a Tier Two stop, but, at the latest, the encounter became a Tier Two stop the second time Defendant Ramirez asked Plaintiff for identification. Dkt. No.

14

33. Plaintiff asserts that the encounter started at "Tier One" but wrongly escalated to "Tier Two" when Ramirez requested Plaintiff's identification and threatened charges for loitering and prowling. Dkt. No. 34 at 2.

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). If "a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." Id. (internal citation and quotations omitted). Ramirez's initial questions to Plaintiff about what he was doing in the shopping center and who he worked for and Defendants' first request for Plaintiff's identification amount to a Tier One interaction. During that time, Plaintiff was not restrained or told he was not free to walk away. See, e.g., Dkt. No. 16-1 at 00:36–1:13; see also Bostick, 501 U.S. at 434 ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." (citation and quotations omitted)). The body camera footage also shows that Defendants were engaged in "non-coercive questioning" with which Plaintiff "voluntar[ily] coopera[ted]." United States v. Armstrong, 722 F.2d 681, 684

15

(11th Cir. 1984) ("The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but rather the voluntary cooperation of the citizen is elicited through non-coercive questioning."). At no point did the officers demand that Plaintiff answer the questions, restrain Plaintiff, or otherwise force Plaintiff to engage with them. The voluntary nature of this encounter remains true even at Defendant Ramirez's first request for Plaintiff's identification. Dkt. No. 16-1 at 01:14-01:16 (asking Plaintiff, "Do you have your license on you by any chance?"); see also I.N.S. v. Delgado, 466 U.S. 210, 216 (1984) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."); Armstrong, 722 F.2d at 684 (concluding that an interaction did *not* rise to the level of a seizure when an officer "requested, but did not demand to see, the [plaintiff's] identification" and "notified [plaintiff] that he was free to leave"). Moreover, Plaintiff's complaint contains no factual allegations to support an inference that Plaintiff did not feel free to leave the premises upon Defendants' initial approach and preliminary questioning.

Plaintiff's interaction with Defendants transitioned from a Tier One encounter to a Tier Two Terry stop roughly one and one-half minutes into the interaction when the "circumstances of the

encounter" became "so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." Delgado, 466 U.S. at 216. At that point, Plaintiff, who was by himself and facing two officers, was informed "if you refuse to identify yourself then you're being charged." Dkt. No. 16-1 at 01:38–01:41. Defendant Ramirez's threat to charge Plaintiff if he did not respond was a "show of official authority such that a reasonable person would have believed he was not free to leave." Thompson, 712 F.2d at 1359 (quotation and citation omitted).

In sum, the Court concludes that Plaintiff was not "seized" within the context of the Fourth Amendment until Defendant Ramirez demanded Plaintiff identify himself and threatened to charge him if he failed to do so. Therefore, the Court must determine whether, at that point in time, Defendant Ramirez had arguable reasonable suspicion to detain Plaintiff.

### b. Arguable Reasonable Suspicion for Terry Stop

Officers can seize a suspect for an investigative stop, or "Terry stop," "where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the circumstances which justified the interference in the first place." Jordan, 635 F.3d at 1186 (citation and quotation omitted). "At the motion-to-dismiss

17

stage, to determine whether the officers had arguable reasonable suspicion, [the Court] must take the allegations in the complaint as true and analyze whether, under the facts as alleged, a reasonable officer could have believed that the stop comported with the Fourth Amendment." Meshal v. Comm'r, Ga. Dep't of Pub. Safety, 117 F.4th 1273, 1287 (11th Cir. 2024) (alterations adopted) (quotation and citation omitted).  As for the bodycam footage, the Court accepts its depictions and construes all ambiguities in favor of Plaintiff.  Jackson, 97 F.4th at 1350; Robinson, 2022 WL 3867584, at *3.

"Reasonable suspicion is a less demanding standard than probable cause[,]" but "the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). In other words, the suspicion "must be more than a mere hunch," and the officer must be able to "point to specific articulable facts that reasonably warrant suspicion" at the time of the stop. United States v. Ballard, 573 F.2d 913, 915 (5th Cir. 1978) (alterations adopted) (citation and quotation omitted).[1] "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might

---

[1] Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981).

well elude an untrained person." United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009) (quotation and citation omitted).

When an officer asserts the defense of qualified immunity, "the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." Jackson, 206 F.3d at 1166. The Court must "examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion." Whittier v. Kobayashi, 581 F.3d 1304, 1309 (11th Cir. 2009). Reasonable suspicion can develop even when "observing exclusively legal activity" that is "seemingly innocuous to the ordinary citizen." United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (citation and quotations omitted); Bautista-Silva, 567 F.3d at 1272 ("We may not consider each fact only in isolation, and reasonable suspicion may exist even if each fact alone is susceptible of innocent explanation." (citation and quotations omitted)). An officer "who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." Jackson, 206 F.3d at 1165–66.

### i. Loitering and Prowling

Plaintiff asserts that Defendant Ramirez unlawfully detained him "without reasonable suspicion of criminal

19

activity." Dkt. No. 1 ¶ 49. According to Defendant Ramirez, the officers had arguable reasonable suspicion that Plaintiff was loitering and prowling to justify the investigatory stop and thus did not violate the Fourth Amendment. Dkt. No. 15 at 9.

The Georgia loitering and prowling statute provides that "[a] person commits the offense of loitering or prowling when he is in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity." O.C.G.A. § 16-11-36(a).

"[T]he conduct sought to be prohibited is only that loitering which creates a danger to persons or property." Bell v. State, 313 S.E.2d 678, 680 (Ga. 1984). Further, the statute "requires at least some manifestation of aberrant behavior." Id. "'[Section] 16-11-36 . . . does not require a suspect to provide information, but, rather, guarantees him the opportunity to explain his conduct, thereby possibly dispelling the officer's concern for the safety of persons or property before any official action is allowed.'" Dunn v. City of Fort Valley, 464 F. Supp. 3d 1347, 1363-64 (M.D. Ga. 2020) (quoting Bell, 313 S.E.2d at 682).

Defendants contend that they had arguable reasonable suspicion to detain Plaintiff because he was holding a stick-like pole toward the ceiling of a Cost Kutter walkway at 12:30

20

in the morning and failed to identify himself. Put differently, according to Defendants, "Plaintiff was in a place both at a time (12:30 a.m.) and in a manner (waving a long pole in the air) that was unusual for law abiding citizens and raised a reasonable concern for safety of the property (disturbing the exterior of a closed business)." Dkt. No. 15 at 11; see also Dkt. No. 18 at 12–13 ("Given the late hour, the deserted location, and the inconsistency of [Plaintiff's] appearance and actions with his proffered explanation for his presence, the officers had reasonable suspicion that [Plaintiff] was loitering.").

Defendants' explanation fails to consider the *point in time* at which the Court looks to determine whether arguable reasonable suspicion was present, that is, the point at which Plaintiff was seized, not the point at which Defendants first saw Plaintiff. See United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) ("[O]fficers can consider everything that happened up to [the point of seizure] to establish reasonable suspicion."). Again, Plaintiff was seized when Defendant Ramirez threatened to charge Plaintiff if he refused to identify himself. Dkt. No. 16-1 at 01:38–01:41.

### Whether the Time was Unusual for a Law-Abiding Individual

By the time Defendant Ramirez threatened to charge Plaintiff, Defendants had seen that the "long stick" Plaintiff

21

was "waving" in the air was actually a long-handled broom, which aligns with Plaintiff's statement that he was cleaning. Indeed, when Defendants approached Plaintiff, they asked "You cleaning?" perhaps indicating that it was apparent Plaintiff was doing so. Dkt. No. 16-1 at 00:40–00:42, 00:57–01:01.  Likewise, Gracia inquired if Plaintiff was sweeping spider webs from the ceiling area to which Plaintiff gave an affirmative response. Dkt. No. 16-1 at 00:40–00:42, 00:57–01:01. Further, by the point of seizure, Defendants had heard Plaintiff explain that he worked for his father's company, D&B Sweepers, which was reportedly contracted by the shopping center to clean the covered walkway, the parking lot, and behind the building. Id. at 00:45–00:51.

It is difficult to maintain that a person who looks like he is cleaning a business and purports to be cleaning a business is doing something unusual by cleaning the business when it is closed.  That is, Plaintiff is *not* "in a place at a *time* . . . not usual for law-abiding individuals."  § 16-11-36(a).  While Defendant Ramirez points out that Plaintiff is outside a closed business at 12:30 a.m., it is not unusual for employees of companies who clean businesses to work at night when businesses are closed.  Accord In re J.B., 725 S.E.2d 810, 815 (Ga. Ct. App. 2012) (stating that "it is hardly naïve (or unreasonable) to think that" children/teenagers who are on break from school would play in vacant lots, "even in areas known for drug or

gang-related activity"). A person of "ordinary intelligence" would know that it is not unusual or unreasonable for a cleaning business to be hired to clean the exterior of a building at night. United States v. Flores-Uriostegui, No. 1:09cr438, 2010 WL 8675217, at *6 (N.D. Ga. Aug. 9, 2010) ("[T]he Georgia loitering statute 'passe[d] constitutional muster in advising persons of *ordinary intelligence* of the conduct sought to be prohibited[.]" (quoting Bell, 313 S.E.2d at 681)). Just like street sweepers clean at night when there is little to no traffic, common sense dictates that cleaning a walkway and parking lot, which Plaintiff stated he was hired to do, is much easier when these areas are not filled with patrons and vehicles, that is, when stores are closed. Indeed, to conduct such cleaning at night is preferable, because the cleaner will not have to work around customers walking to and from and will not risk debris falling on patrons. It is also not unusual for retail stores to close as late as ten o'clock at night, which means exterior cleaning is likely to occur even later at night. Therefore, a reasonable officer on the scene would not have had arguable reasonable suspicion that Plaintiff was in a place at a time unusual for law-abiding individuals.

### Whether Manner was Unusual for a Law-Abiding Individual

Next, the Court must determine, under the loitering and prowling statute, whether Plaintiff was acting "in a manner not

usual for law-abiding individuals." § 16-11-36(a). The word "manner" implies a behavior or conduct. See Model Penal Code & Commentaries § 250.6 (1980), at 391 ("Liability is based not on a status . . . but on present *conduct* of an unusual sort." (emphasis added)). The bodycam video footage shows Plaintiff actively sweeping the walkway ceiling with a long-handled broom when Defendants arrived. As the officers approached Plaintiff, he lowered the broom, he removed the hood from his head, and he answered their questions calmly. Plaintiff said he was cleaning. He was armed only with a broom, which he was using for its intended purpose. He made no attempt to flee or conceal. However, Plaintiff refused Defendants' requests that he identify himself.

In the bodycam footage, at the time of Plaintiff's seizure, Defendant Ramirez clearly emphasized that Plaintiff's refusal to identify himself would result in charges being brought against him. Dkt. No. 16-1 at 01:38-01:40. Importantly, "although police have the right to approach individuals and ask questions, the individual has no obligation to respond and may decline to answer and simply go on his or her way and the refusal to respond alone d[oes] not provide a legitimate basis for an investigative stop." Brown, 2018 WL 2925919, at *11 (citing Wardlow, 528 U.S. at 122-23). However, a person's refusal to cooperate can contribute to reasonable suspicion. Brown, 2018

24

WL 2925919, at *11. Therefore, the Court looks to the surrounding circumstances to determine whether they, combined with Plaintiff's refusal to identify himself, create arguable reasonable suspicion for the <u>Terry</u> stop.

### **Whether Circumstances that Warrant Alarm Existed**

"'[T]he words "under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity" mean those circumstances where peace and order are threatened or where the safety of persons or property is jeopardized.'" <u>Dunn</u>, 464 F. Supp. 3d at 1363. A few nonexclusive and nonexhaustive circumstances to consider in determining if "alarm is warranted" are whether "the person takes flight upon the appearance of a law enforcement officer, refuses to identify himself, or manifestly endeavors to conceal himself or any object." <u>Id.</u> § 16-11-36(b); <u>In re R.F.</u>, 632 S.E.2d 452, 456 (Ga. Ct. App. 2006). "However, these guidelines do not require the officer to make an arrest, even if one or more of the situations suggested therein is present." <u>Bell</u>, 313 S.E.2d at 681. Furthermore, an officer must provide a "person an opportunity to dispel any alarm or immediate concern which would otherwise be warranted by requesting the person to identify himself and explain his presence and conduct." O.C.G.A. § 16-11-36(b).

To show alarm was warranted, Defendant Ramirez relies heavily on Plaintiff's refusal to identify himself. As discussed supra, that, by itself, "d[oes] not provide a legitimate basis for an investigative stop." Brown, 2018 WL 2925919, at *11 (citing Florida v. Royer, 460 U.S. 491 (1983)). Because Defendant Ramirez cannot point to any other aberrant conduct on Plaintiff's part, that is, Plaintiff did not attempt to flee or conceal, Ramirez instead offers *non*-conduct to show alarm was warranted. Specifically, Defendants state neither Plaintiff's clothing nor vehicle "bore any professional insignia," and Plaintiff had a skateboard but no other "cleaning supplies or other work-related items." Dkt. No. 18 at 12-13. Finally, Defendants state "a ceiling tile was dislodged in the area where [Plaintiff] had been poking the broom," and they were concerned "damage to such property might *actively be occurring*." Id. at 12 (emphasis in original).

Curiously, none of these concerns—the lack of insignia or other cleaning supplies, the skateboard, the askew tile—were mentioned in Defendants' incident report. See Dkt. No. 18-1. Additionally, Defendants never mentioned these concerns to Plaintiff or asked him to explain them. O.C.G.A. § 16-11-36(b) (requiring officers to give plaintiff an opportunity to dispel their concerns before taking official action). Regardless, the Court must evaluate the "totality of the circumstances" to

26

determine whether Defendants had a "'particularized and objective' basis" for their suspicion. <u>Whittier</u>, 581 F.3d at 1309.

First, to require someone hired to clean a store's outside walkway and parking lot to display a business insignia on clothing or a vehicle to ward off arguable reasonable suspicion of loitering and prowling approaches the imposition of an unreasonable level of sophistication of companies providing this service. More importantly, Defendants do not explain how a lack of insignia creates "immediate concern for the safety of persons or property." § 16-11-36(a). The lack of insignia, even combined with Plaintiff's refusal to identify himself, does not amount to arguable reasonable suspicion in this case.

Relatedly, to the extent Defendants argue Plaintiff's manner of dress was concerning, that Plaintiff was wearing a hooded jacket does not appear unusual or unreasonable for December in Brunswick, Georgia. Indeed, in the bodycam footage, Defendants themselves can be seen in long sleeves (possibly jackets), and Plaintiff's girlfriend can be seen wearing jeans and a sweatshirt and folding her arms tightly, indicating she was cold.

Next, Defendants take issue with Plaintiff having no cleaning supplies other than a long-handled broom. Dkt. No. 18 at 12-13. But Defendants do not explain what other cleaning

27

supplies or equipment is necessary to clean the store's outside walkway and parking lot or why a lack of other cleaning supplies contributes to their perception that Plaintiff threatened the safety of persons or property. Dunn, 464 F. Supp. 3d at 1347 ("Defendants' arguments don't explain how [plaintiff] threatened peace and order[.]"). It is therefore unclear why the lack of other cleaning supplies supports an arguable reasonable suspicion that Plaintiff was loitering and prowling. Further, Plaintiff *did* have a broom with what appears to be a pole extension attached to it, Plaintiff can be seen sweeping the ceiling in the bodycam footage, and the bodycam footage also shows a trash bin nearby. Dkt. No. 16-1 at 00:31.

Next, Defendants take issue with Plaintiff being in possession of a skateboard. Dkt. No. 18 at 13. Again, Defendants do not explain why Plaintiff having a skateboard detracts from his story—that he was hired to clean the outside of the building—or how the presence of a skateboard is a circumstance that warrants "a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity." O.C.G.A. § 16-11-36(a); see also Dunn, 464 F. Supp. 3d at 1365; Model Penal Code § 250.6, at 391 ("Liability is based not on a status . . . but on present conduct of an unusual sort.").

28

Lastly, Defendants point to an askew ceiling tile "where [Plaintiff] had been poking the broom," arguing this caused concern for property damage. Dkt. No. 18 at 12; see also O.C.G.A. § 16-11-36(a) (loitering statute requires "circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity"). The single askew ceiling tile, along with seventy-plus perfectly placed ceiling tiles, can be seen in the bodycam footage.

Defendants' argument leaves much to be desired. First, Defendants' contention that Plaintiff was "poking" the ceiling with the broom is not supported by the bodycam footage, which shows Plaintiff performing fast *sweeping*—not poking—motions toward the walkway ceiling. Additionally, Defendants' characterization that the askew ceiling tile was in the overhead area Plaintiff had been sweeping is not clear from the bodycam footage, which shows the subject tile could be several feet away from the area Plaintiff was sweeping and outside Plaintiff's reach. Jackson, 97 F.4th at 1350 ("When [a court] review[s] video footage at the motion to dismiss stage, [it] 'must construe all ambiguities in the video footage in favor of the plaintiff.'"). In fact, the tiles immediately above Plaintiff, where the bodycam footage clearly shows he *was* sweeping, are undisturbed. And Defendants do not state they saw Plaintiff

29

dislodge the ceiling tile.  Under these circumstances, it is unreasonable to attribute to Plaintiff a single dislodged ceiling tile, particularly when it is not uncommon for ceiling tiles—especially exterior ones—to become dislodged.  Based on these facts, the Court cannot conclude, as a matter of law, that Defendants had a justifiable and reasonable concern for the safety of property in the vicinity.  See O.C.G.A. § 16-11-36(a); Bell, 313 S.E.2d at 680 ("[T]he conduct sought to be prohibited is *only* that loitering which creates a danger to persons or property" (emphasis added)).

The Court must evaluate the "totality of the circumstances" to determine whether Defendants had a "'particularized and objective' basis" for their suspicion. Whittier, 581 F.3d at 1309. Indeed, the Court's reasonable suspicion calculus must take into account all of the facts available to the officers, including those that *dispel* the officers' suspicions. United States v. Cortez, 449 U.S. 411, 417 (1981). Thus, after viewing the bodycam footage in the light most favorable to Plaintiff, the Court simply cannot accept Defendant Ramirez's argument that a reasonable officer, in Defendants' position, would believe Plaintiff was loitering and prowling when Ramirez threatened to arrest Plaintiff if he failed to identify himself.

Accordingly, Defendant Ramirez had no authority to escalate the encounter from a first-tier encounter to a second-tier

30

encounter on that basis.  State v. Copeland, 850 S.E.2d 736, 745 (Ga. 2020); see also Jordan, 635 F.3d at 1186 (noting that one requirement of a Terry stop is that "officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity").  "In fact, construing the facts in a light most favorably to [Plaintiff], it appears that [Defendant Ramirez was] clearly annoyed that [Plaintiff] did not immediately produce his identification."  Dunn, 464 F. Supp. 3d at 1365.  Under Georgia law, "there is no legal requirement that [Plaintiff] had to actually provide the information [Defendants] requested."  Id.  (citing  Bell,  313  S.E.2d  at  682). Additionally,  "Defendants  fail  to  show  that  [Plaintiff] jeopardized the peace and safety or that anyone was reasonably alarmed (as opposed to merely annoyed) by his presence as is required  by  the  loitering  statute."  Id.  (denying qualified immunity at motion to dismiss stage).  Accordingly, Plaintiff has alleged a constitutional violation on the part of Defendant Ramirez *unless* Defendant Ramirez can show he had arguable reasonable  suspicion  to  believe  Plaintiff  was  committing  a different offense.  See Metz v. Dodson, No. 1:22-cv-303, 2023 WL 2974939, at *6 (M.D. Ala. Feb. 22, 2023) (If the officer "had arguable  reasonable  suspicion  to  detain  for  any  offense, qualified immunity will apply.").

**ii. Other Crime—Trespass**

31

Defendant Ramirez argues that even if he did not have arguable reasonable suspicion to stop Plaintiff for loitering and prowling, he had reason to suspect that Plaintiff was engaged in other criminal activity like trespass. Dkt. No. 15 at 11. One way that an individual can be guilty of criminal trespass in Georgia is if he "enters upon the land or premises of another person . . . for an unlawful purpose." O.C.G.A. § 16-17-21(b)(1). Defendant Ramirez argues that Plaintiff's presence at a closed business at 12:30 a.m. while "waving a long pole" gives rise to arguable reasonable suspicion to approach and detain Plaintiff to investigate whether he was allowed to be there. Dkt. No. 15 at 11. Again, this position assumes that the relevant time that Defendants must possess arguable reasonable suspicion to justify the detention was upon first approaching Plaintiff. This is not so. As determined supra, Plaintiff was not seized for Fourth Amendment purposes until Defendant Ramirez threatened to arrest him if he did not identify himself. It was at that point that Ramirez needed arguable reasonable suspicion to detain Plaintiff.

By the time Plaintiff was seized, Plaintiff had explained to Defendant Ramirez that Plaintiff was in the shopping center because he was hired to clean it, and Plaintiff provided Defendant with the name of his company and the areas of the shopping center he was hired to clean.   Thus, at the time of

32

seizure, Plaintiff had provided details about his lawful presence on the premises. Notably, other than conclusory statements, Defendants do not state they believed Plaintiff was lying or provide an explanation as to why they did not believe Plaintiff. See Dkt. No. 18 at 18 (arguing the "explanation for [Plaintiff's] presence . . . seems potentially inconsistent with his appearance and actions"). Drawing all reasonable inferences in favor of Plaintiff, a reasonable officer would not have concluded he had arguable reasonable suspicion that Plaintiff had "enter[ed] upon the land or premises of another person . . . for an unlawful purpose." O.C.G.A. § 16-17-21(b)(1). Therefore, Defendant Ramirez did not have arguable reasonable suspicion to detain Plaintiff pursuant to a Terry stop and require that he identify himself. Plaintiff has therefore alleged a constitutional violation by Defendant Ramirez.

### c. Arguable Probable Cause

Plaintiff next alleges that Defendant Ramirez arrested him without probable cause. Dkt. No. 1 ¶ 49. Defendant Ramirez argues there was at least arguable probable cause to arrest Plaintiff for obstruction because Plaintiff repeatedly disregarded Defendants' commands to identify himself. Dkt. No. 15 at 13.

For qualified immunity to apply in the context of a false arrest, "an officer need not have actual probable cause, but only 'arguable' probable cause." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010) (citation and quotations omitted); see also Edger v. McCabe, 84 F.4th 1230, 1235-37 (11th Cir. 2023); Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001); Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009). This is necessarily an easier standard to meet than probable cause. Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry.").

"An officer has *arguable* probable cause if 'a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests.'" Garcia v. Casey, 75 F.4th 1176, 1186 (11th Cir. 2023) (emphasis in original) (quoting District of Columbia v. Wesby, 583 U.S. 48, 68 (2018)).  Accordingly, "[a]n officer lacks arguable probable cause only if 'the state of the law on the date of the alleged misconduct makes it obvious that the officer's acts violated the plaintiff's rights in the specific set of circumstances at issue.'" Id. (alteration accepted) (quoting Washington v. Howard, 25 F.4th 891, 902 (11th Cir. 2022)). In Garcia, the Eleventh Circuit explained:

> We believe the doctrine of "arguable probable cause"
> is a useful shorthand to collapse these three

inquiries into a single question in a wrongful arrest case. That is, we must ask whether "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." Wesby, 583 U.S. at 68. So an officer may lack arguable probable cause because an existing precedent establishes that there was no actual probable cause for an arrest on similar facts. Or an officer may lack arguable probable cause because the text of an applicable statute plainly precludes him from making an arrest under that statute. Or the officer may have been so lacking in evidence to support probable cause that the arrest was obviously unconstitutional. But the arguable probable cause inquiry in a false arrest case is no different from the clearly established law inquiry in any other qualified immunity case. Unless the law "makes it obvious that the [officer's] acts violated the plaintiff's rights," Washington, 25 F.4th at 903, the officer has qualified immunity.

75 F.4th at 1187 (alteration in original); see also Poulakis v. Rogers, 341 F. App'x 523, 526 (11th Cir. 2009) ("In other words, [the Eleventh Circuit] ha[s] said that when an officer violates the Constitution because he lacked probable cause to make an arrest, the officer's conduct may still be insulated under the second prong of qualified immunity if he had 'arguable probable cause' to make the arrest." (citing Case, 555 F.3d at 1327)).

"The concept of arguable probable cause therefore allows for the possibility that an officer might 'reasonably but mistakenly conclude that probable cause is present.'" Khokhar, 884 F.3d at 1298 (quoting Brown, 608 F.3d at 735). Moreover, while "an officer 'is not required to explore and eliminate every theoretically plausible claim of innocence before making

an arrest,' the officer 'may not choose to ignore information that has been offered to him or her . . . or elect not to obtain easily discoverable facts.'" Jackson v. Cowan, No. 19-13181, 2022 WL 3973705, at *5 (11th Cir. Sept. 1, 2022) (alteration in original) (citation omitted). "Although arguable probable cause does not 'require proving every element of a crime,' qualified immunity is not appropriate when a reasonable officer, based on readily available information, would have known that the plaintiff's conduct did not satisfy an element of the offense." Id. at *6 (citations omitted).

"Whether an officer has probable cause or arguable probable cause, or neither, 'depends on the elements of the alleged crime and the operative fact pattern.'" Khokhar, 884 F.3d at 1298 (quoting Brown, 608 F.3d at 735); see also Edger, 84 F.4th at 1237; Grider v. City of Auburn, 618 F.3d 1240, 1257 (11th Cir. 2010) (stating that whether an officer has arguable probable cause depends on the "elements of the alleged crime and the operative fact pattern" (citing Skop, 485 F.3d at 1137–38)). So, the totality of the facts and circumstances known to Defendant Ramirez, not one fact or circumstance alone, determines whether he had probable cause or arguable probable cause to arrest Plaintiff. Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with

probabilities and depends on the totality of the circumstances." (citations omitted)); United States v. Arvizu, 534 U.S. 266, 274 (2002) (rejecting a "divide-and-conquer analysis" which ignores an officer's observation that was "by itself readily susceptible to an innocent explanation").

Defendant Ramirez asserts that he had arguable probable cause to arrest Plaintiff for obstruction under Georgia law.[2] Dkt. No. 15 at 12-13 (arguing that because Defendant Ramirez "had reasonable suspicion to stop Plaintiff, Plaintiff's refusal to identify himself gave Officer Ramirez probable cause to arrest Plaintiff for obstruction"). In Georgia, an individual is guilty of obstruction of officers if he "knowingly and willfully obstructs or hinders any law enforcement officer . . . in the *lawful discharge* of his or her official duties" or "knowingly and willfully resists, obstructs, or opposes any law enforcement officer . . . in the *lawful discharge* of his or her official duties by offering or doing violence to the person of such officer." O.C.G.A. § 16-10-24(a)-(b) (emphasis added). "[T]he standard for determining whether an officer was lawfully discharging his duties such that a refusal to provide identification would constitute obstruction is whether a

_____

[2] Notably, Defendant Ramirez does not argue he had arguable probable cause to arrest Plaintiff for loitering and prowling. See Dkt. No. 15 at 12.  However, "[t]he existence of arguable probable cause for any arrestable offense provides qualified immunity."  Andrews v. Marshall, 845 F. App'x 849, 853 (11th Cir. 2021).

reasonable suspicion existed to stop the individual charged with obstruction." Gainor v. Douglas Cnty., Ga., 59 F. Supp. 2d 1259, 1282 (N.D. Ga. 1998).

With this in mind, Defendant Ramirez "lawfully discharge[d]" his duties by arresting Plaintiff only if he had arguable reasonable suspicion that Plaintiff was engaged in criminal activity, like loitering and prowling or trespass, and, as a result, Plaintiff's failure to identify himself amounted to obstruction. The Court holds that Defendant Ramirez did not have arguable reasonable suspicion that Plaintiff was loitering and prowling or criminally trespassing to justify seizing him and demanding his identification. See supra. Accordingly, because Defendant Ramirez did not have arguable reasonable suspicion that Plaintiff was committing a crime, he did not have arguable probable cause to arrest Plaintiff for failing to identify himself when asked. Meshal, 117 F.4th at 1289 (citing United States v. Clark, 32 F.4th 1080, 1087 n.1 (11th Cir. 2022) (noting that reasonable suspicion is a "lower standard" than probable cause so, necessarily, the failure to satisfy arguable reasonable suspicion means the failure to show arguable probable cause)).

### 2. Defendant Gracia

As a preliminary matter, Defendant Gracia argues that Plaintiff's Fourth Amendment claims against him must fail

because Defendant Gracia did not participate in the investigative stop or the arrest. Dkt. No. 18 at 9. Although Plaintiff's complaint asserts that "Defendant(s) Gracia and/or Ramirez" questioned him and arrested him, the video footage attached to Defendants' motions to dismiss shows that Defendant Ramirez primarily handled the investigative stop, and Ramirez—not Gracia—ultimately arrested Plaintiff. See generally Dkt. Nos. 16-1, 18-2.

In Wilkerson, the Eleventh Circuit held that "a participant in an arrest, even if not the arresting officer, may be liable if he knew the arrest lacked any constitutional basis and yet participated in some way." Wilkerson v. Seymour, 736 F.3d 974, 980 (11th Cir. 2013). Though the Wilkerson court applied that standard in the context of a failure to intervene claim, id. at 979, it is nevertheless instructive to Plaintiff's Fourth Amendment claims against Defendant Gracia. The Wilkerson court looked to Jones v. Cannon where the Eleventh Circuit addressed whether an officer "was sufficiently involved in th[e] initial warrantless arrest to be liable for false arrest." 174 F.3d 1271, 1284 (11th Cir. 1999). The court concluded that there was at least a question of fact about this because the officer "took notes from which [the other officer] prepared the police report about the arrest" and "more importantly, [both officers] together transported [plaintiff] to the jail." Id. So, too,

39

here. Defendant Gracia asked questions at the beginning of Defendants' interaction with Plaintiff, specifically inquiring whether Plaintiff was cleaning and removing spider webs. Dkt. No. 18-2 at 00:40-01:04. In fact, the first four questions the officers asked when they approached Plaintiff came from Defendant Gracia. Id. Furthermore, Defendant Gracia took out a notepad and appeared to write on it while Defendant Ramirez asked Plaintiff for his identification. Id. at 01:13-01:41. When Defendant Ramirez ultimately cuffed Plaintiff, Defendant Gracia stood right beside both Plaintiff and Ramirez and can be heard on the camera footage telling Plaintiff's girlfriend to "please step back." Id. at 02:23-02:30. Lastly, at the end of the footage, both Defendant Gracia and Defendant Ramirez were in the patrol vehicle that took Plaintiff to the jail. Dkt. No. 16-1 at 16:25-17:16. Thus, even though Defendant Gracia was not the officer leading the investigation or the arrest, at this stage, Plaintiff has plausibly alleged violations of his Fourth Amendment rights against Defendant Gracia.

### B. Clearly Established Law

To prevail against the assertion of qualified immunity, Plaintiff must show—in addition to a constitutional violation— that "when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful." Post v. City of Fort

Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993). A right is clearly established for purposes of the qualified immunity defense when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015); see also Lassiter v. Ala. A&M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) ("Unless a government agent's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent officer or one who has knowingly violated the law would have done such a thing, the government actor has immunity from suit.").

A law is "clearly established" if (1) "a materially similar case has already been decided, whose facts are similar enough to give the police notice," (2) "a broader, clearly established principle should control the novel facts of his case," such as a statement of law in the Constitution, statutes, or case law, or (3) plaintiff shows that "the officer's conduct so obviously violates [the] constitution that prior case law is unnecessary." Edger, 84 F.4th at 1235 (internal quotations and citation omitted). Though the "specific context of the case" matters here, the Court should "not require a case directly on point for a right to be clearly established." Id. Moreover, "[i]n considering a defendant's motion to dismiss or for judgment as a matter of law based on qualified immunity, the district court

41

must examine the complaint to determine whether, under the most favorable version of the facts alleged, defendant's actions violate clearly established law." Nolen v. Jackson, 102 F.3d 1187, 1190 (11th Cir. 1997) (citation and quotations omitted).

Defendant Gracia argues that "[n]one of the courts that can clearly establish the law for the purposes of this case has held that an officer lacks  arguable reasonable suspicion for a Terry stop when he sees a lone person outside a closed store in an empty shopping center late at night, notices that the person is poking at and potentially damaging the building, and is given an explanation for the person's presence that seems potentially inconsistent with his appearance and actions." Dkt. No. 18 at 18. Defendant Gracia attempts to put Plaintiff in a position where he must identify "a case directly on point for a right to be clearly established." Edger, 84 F.4th at 1235. The qualified immunity analysis does not require this level of specificity; neither does the Court. Id. Defendant Ramirez argues that "the law is clear" that the offense of obstruction under Georgia law occurs when an individual fails to identify himself during a Terry stop and follow the commands of the officers. Dkt. No. 15 at 15. However, as the Court concludes supra, when viewing the bodycam footage and drawing all reasonable inferences in favor of Plaintiff, Plaintiff has sufficiently alleged that Defendants lacked arguable probable cause to arrest him for obstruction, as

well as arguable reasonable suspicion to detain him for either loitering and prowling or trespassing. Without a doubt, it was clearly established at the time of Plaintiff's arrest that any arrest made without probable cause violates the Fourth Amendment. Grider, 618 F.3d at 1258 ("And in the qualified immunity context, it is well established that arrests without probable cause violate the Fourth Amendment."); Herren v. Bowyer, 850 F.2d 1543, 1547 (11th Cir. 1988) ("The law is 'clearly established' that an arrest without a warrant or probable cause to believe a crime has been committed violates the fourth amendment."). So, too, was it clearly established that an investigatory stop must be supported by reasonable articulable suspicion that the individual is committing a crime. Reid v. Georgia, 448 U.S. 438, 440 (1980) ("While the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity."); Terry, 392 U.S. at 21 ("[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."). As such, for purposes of Defendant Ramirez and Gracia's motions to dismiss, the Court holds that

43

Plaintiff has sufficiently alleged that Defendants violated clearly established law and are not entitled to qualified immunity at this time.  Defendant Ramirez and Gracia's motions to dismiss are **DENIED**.

### II.  Failure to State a Claim

The Court next addresses the motion to dismiss filed by Defendant Miller.  Plaintiff argues he plausibly alleged that Defendant Miller failed to intervene and prevent his false arrest. Dkt. No. 26 at 19. Specifically, Plaintiff asserts that Defendant Miller had notice or knowledge that Plaintiff was unlawfully arrested and failed to stop it. Id. Defendant Miller argues Plaintiff has failed to allege facts to state a claim against him.

In the Eleventh Circuit, "'[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force' can be liable for failing to intervene, so long as he 'was in a position to intervene yet failed to do so.'" Alston v. Swarbrick, 954 F.3d 1312, 1321 (11th Cir. 2020) (citing Hadley v. Guitierrez, 526 F.3d 1324, 1330 (11th Cir. 2008)). Relatedly, if an officer participates in an arrest, even if not the arresting officer, he "may be liable if he knew the arrest lacked any constitutional basis and yet participated in some way." Wilkerson, 736 F.3d at 980.

44

Plaintiff alleges that Defendant Miller appeared on the scene and observed and ratified the unlawful search and arrest of Plaintiff. Dkt. No. 1 ¶ 58. However, the body camera footage shows that Defendant Miller did not appear on the scene until approximately ten minutes into Defendants Ramirez and Gracia's interaction with Plaintiff.[3] Dkt. No. 16-2 at 10:28–10:50 (showing Defendant Miller's patrol car arriving and Defendant Miller exiting the vehicle to approach Ramirez, Gracia, and Plaintiff's girlfriend). At that point, Plaintiff had already been arrested, searched, and placed and buckled into Ramirez and Gracia's patrol car for more than five minutes. Id. at 01:25 (showing Defendant Ramirez cuffing Plaintiff), id. at 01:56–04:20 (showing Defendant Ramirez patting down Plaintiff, putting Plaintiff in the patrol car, buckling him in, and closing the door), id. at 10:28 (showing Defendant Miller first arriving). Thus, even when accepting Plaintiff's allegations as true and drawing inferences in his favor, it would be unfounded to conclude that Defendant Miller participated in the arrest or "was in a position to intervene yet failed to do so." Hadley, 526 F.3d at 1331. All the facts presented show that Defendant Miller did not even arrive on the scene until after the allegedly unconstitutional conduct had occurred.

---

[3] The body camera footage directly captures Defendant Miller's car arriving and Defendant Miller exiting the vehicle about ten and one-half minutes into the video feed. Dkt. No. 16-2 at 10:25–10:47.

To be sure, Defendant Miller did play a minor role after arriving on the scene. The body camera footage shows that while Defendants Ramirez and Gracia were verifying Plaintiff's girlfriend's identity, Defendant Miller asked Defendant Ramirez or Gracia,[4] "what happened?" and he is told "loitering and prowling." Dkt. No. 16-2 at 13:30–13:32. Defendant Miller then asks the officers if Plaintiff "took off," making a running motion with his arms, and either Defendant Ramirez or Gracia responded that Plaintiff "refuse[d] to identify himself." Id. at 13:33–13:37. Defendant Miller then says "oh." Id. at 13:37. Still, asking two questions is not enough to constitute a "failure to intervene" as the non-arresting officer for two reasons.

First, the Eleventh Circuit has held that an officer did not have the "requisite information to put him on notice that an unlawful arrest was occurring or had occurred" in a situation where an officer knew more than Defendant Miller did here. Wilkerson, 736 F.3d at 980. Just like in this case, in Wilkerson, the officer, Sergeant Parker, arrived on the scene after the plaintiff had already been placed under arrest and put into a transport car. Id. However, in Wilkerson, Sergeant Parker spoke to the arresting officer "for only a few minutes" and then spoke with the plaintiff-arrestee "for less than one minute."

---

[4] It is unclear in the footage which officer responds to Defendant Miller. See Dkt. No. 16-2 at 13:30–13:32.

46

Id. Here, Defendant Miller spoke to the arresting officers for only a few *seconds*, and Plaintiff does not allege, nor is it reflected in the bodycam footage, that Defendant Miller spoke with Plaintiff at all. Dkt. No. 16-2 at 13:30–13:37. Further, like the plaintiff in Wilkerson, Plaintiff does not allege that he "said something after the fact that placed [Defendant Miller] on sufficient notice of the unconstitutionality of [his] arrest." Wilkerson, 736 F.3d at 980. Lastly, the Wilkerson court stated that the non-arresting officer was "entitled to rely on the account of the arrest provided by [the arresting officer] and fill in any gaps in the account with reasonable inferences premised on [the arresting officer] acting in a constitutional manner and in good faith." Id. Certainly, if the officer in Wilkerson who spoke to the other officers for a few minutes and talked to the plaintiff for a short amount of time did not have sufficient information to be "on notice" of an unconstitutional arrest, then Defendant Miller, who spoke to the other officers for only seconds and did not speak with Plaintiff, also did not have sufficient information to be "on notice." Id.

In other cases where officers were found not liable for failing to intervene, the officers were actually present on the scene at the time of the arrest. See, e.g., Swarbrick, 954 F.3d at 1321 (stating that the officer who allegedly failed to intervene was at the scene, "freed [plaintiff's] foot that was

47

stuck" in the car doorway, and helped restrain another individual, but the plaintiff did not allege "what further steps [the officer] should have taken or that he had the opportunity to take further steps"); Hadley, 526 F.3d at 1331 (concluding that an officer did not commit a constitutional violation when he did not prevent another officer from punching plaintiff in the stomach). As discussed thoroughly above, Defendant Miller was not even on the scene at the time of Plaintiff's arrest and, thus, is even less culpable than the defendant officers in the aforementioned cases.

In sum, even when accepting the facts alleged in the complaint as true, the Court concludes that Plaintiff has not sufficiently pled a claim against Defendant Miller. The video footage and Plaintiff's complaint are devoid of facts to show Defendant Miller ratified the unlawful search and arrest, failed to intervene, or even had a chance to intervene. Likewise, Defendant Miller lacked sufficient information to be on "notice" that Plaintiff's constitutional rights were violated.[5] Accordingly, Defendant Miller's motion to dismiss the claims against him is **GRANTED**.

---

[5] In fact, even if Defendant Miller believed that Plaintiff's rights had been violated, Miller would have been too late to prevent the harm from occurring. Defendants Ramirez and Gracia had already arrested Plaintiff by the time Defendant Miller arrived, so Defendant Miller was not "in a position to intervene," nor did he "participate" in the alleged harm. Swarbrick, 954 F.3d at 1321 (citation omitted); Wilkerson, 736 F.3d at 980.

**CONCLUSION**

Pursuant to the parties' agreement, the following claims are **DISMISSED**: Plaintiff's claims against Defendants Glynn County and Glynn County Police Department; Plaintiff's official capacity claims against Defendants Gracia, Ramirez and Miller; and Plaintiff's assault and/or battery and false imprisonment claims against Defendant Gracia and Ramirez. Dkt. Nos. 15, 18. The Clerk is **DIRECTED** to terminate Glynn County and Glynn County Police Department as Defendants in this action.

Further, Defendant Miller's motion to dismiss, dkt. no. 18, is **GRANTED**. The Clerk is **DIRECTED** to terminate Miller as a Defendant in this action.

Finally, Defendants Ramirez and Gracia's motions to dismiss, dkt. nos. 15, 18, are **DENIED** as to Plaintiff's Fourth Amendment claims against them in their individual capacities.

The stay of deadlines is hereby lifted, and the parties are **ORDERED** to file their Rule 26(f) report within **fourteen (14) days** of the date of this Order.

**SO ORDERED**, this 12th day of March, 2026.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

49